**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

NOAH T. BYRD

Ave Parque Azteca Sur 8
MZ 51 LT 108
Playas Seccion Dorado
Tijuana, Baja California, Mexico          Civil Action No. 1:23-cv-1512
C.P. 22505-CR-22001

        Plaintiff,

    v.

DEPARTMENT OF DEFENSE

1000 Defense Pentagon,
Washington, DC
20301-1000

        Defendant.

**COMPLAINT FOR**
**JUDICIAL REVIEW AND DECLARATORY RELIEF**

**INTRODUCTION**

1.     This is an action under the Administrative Procedures Act, 5 U.S.C. § 701 *et seq*.

("APA"), for judicial review of a decision by the Board for Correction of Naval Records

("BCNR" or "Board") rejecting the claim of Plaintiff Noah T. Byrd ("Byrd") for medical

disability retirement for his combat-related post-traumatic stress disorder ("PTSD") as a result of

its failure to properly apply the required statutory and regulatory standard of fitness that a service

member be found unfit when unable to perform the duties of his office, grade, rank, or rating as a

result of a mental health condition that he incurred while entitled to basic pay.

2.     Byrd joined the United States Navy in 2005 as a Navy Airman, Aviation

Machinist's Mate ("ADAN"). As an ADAN (and upon his later promotion to Petty Office Third

Class) Byrd's primary duties involved numerous aspects of maintaining aircraft, primarily SH-60 Bravo helicopters, as well as F/A-18 Super Hornet, attaining the status of plane captain for the SH-60. While he was forward deployed on the U.S.S. Simpson, Byrd volunteered for a program that would begin upon completion of his current deployment, joining a unit that would deploy and relieve U.S. Army units from overseas deployments. After training at Fort Dix, New Jersey, to serve in the role of a military police officer, Byrd deployed as a Detainee Guard to Camp Bucca, Iraq in 2008 and through early 2009, where he was responsible for the custody, accountability, and security of 3,000 high-threat national security detainees. Through all these assignments, Byrd consistently received high marks in his evaluations, being described as "self starting and motivated," with a "great attitude every day, always displaying good military bearing," "showing reliability in every task assigned" and "excellent initiative." In another evaluation, he was identified as an "invaluable asset" and a "rising star' who had "astute attention to detail," a "devote worker," and a "dedicated team player" with "unwavering reliability." While in Iraq, his commander identified him as the "#1 MP of 36 Third Classes" at his duty station.

3.      After returning from Iraq, Byrd began experiencing symptoms of PTSD that interfered with his ability to perform an ADAN. This was inconsistent with all his prior service as acknowledged in his pre-Iraq deployment evaluations. As a result, Byrd was placed on limited duty and removed from his ADAN duties to work as a Front Desk Clerk. Despite these changes, Byrd's mental health condition failed to prove to allow his return to full duty as an ADAN. As such, Byrd was referred into the Disability Evaluation System ("DES"). While in the DES process, Byrd was hospitalized twice for his PTSD. Nonetheless, the Physical Evaluation Board ("PEB") found Byrd fit for duty by relying on erroneous facts, including that Byrd's PTSD was

better characterized as non-compensable adjustment disorder, and factors irrelevant to a fitness determination, such as Byrd's demeanor at his PEB hearing.

4.      Erroneously found fit for duty, Byrd reached his mandatory separation date and was honorably discharged in February 2012. Shortly thereafter, Byrd applied for Veterans Affairs ("VA") disability benefits and was awarded a 100 percent disability rating for his PTSD alone, which was made effective from his date of discharge.

5.      Byrd thereafter applied to the Board for Correction of Naval Records arguing that it was an error and an injustice for him to be found fit and separated upon completion of his service, as opposed to being found unfit for his PTSD and awarded permanent disability retirement. The BCNR denied his application on December 15, 2017, relying on irrelevant criteria and erroneous facts, including his demeanor at his formal PEB, his positive performance reviews while a Front Desk Clerk, and his erroneous adjustment disorder diagnosis. In reaching its decision, the BCNR also erroneously held that the VA's 100 percent disability rating was "not probative" evidence of Byrd's unfitness and that since he was no longer a Plane Captain, his continued service as an ADAN presented no risk to the Navy or to Byrd himself.

6.      Byrd later reapplied to the BCNR (after having been granted permanent and total disability status from the Department of Veteran's Affairs), and this second application was denied on September 17, 2021. This decision referred to the prior decision as justification of the denial.

7.      The BCNR's decision to uphold Byrd's fit finding was arbitrary, capricious, unsupported by substantial evidence, and contrary to law. The BCNR's decision relied on factors that were irrelevant and/or contrary to the applicable fitness standards established by law, as set forth in 10 U.S.C. § 1201 and Department of Defense Instruction ("DoDI") 1332.38. Had the

proper, and sole standard of fitness been applied, Byrd's PTSD would have been found to render him unfit at discharge with a 100 percent disability rating.

8.  Byrd seeks, among other relief, an order under 5 U.S.C. § 706 setting aside the BCNR's decision and compelling the BCNR to place Byrd on the Permanent Disability Retired List as of 2012, with a 100 percent disability rating as established by the VA, a rating that therefore entitles him to medical retirement and the benefits that go with it.

## JURISDICTION AND VENUE

9.  This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this case raises federal questions under the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*, Plaintiff also seeks relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202.

10.  Plaintiff seeks solely equitable relief in this action, namely, an increase of his military disability rating and to be placed into medical retirement status.

11.  The BCNR's decision constitutes final agency action for which there is no other adequate remedy in court. *See* 28 U.S.C. § 704.

12.  Venue in this Court is proper under 28 U.S.C. § 1391 because the BCNR, which is organized under the Department of Defense, resides in Washington, D.C. and the acts or omissions giving rise to this lawsuit took place in the judicial district of the District of Columbia.

## PARTIES

13.  Plaintiff Noah T. Byrd is a citizen of the United States, a veteran of the United States Navy, currently resides in Tijuana, Mexico but maintains a mailing address in San Ysidro, California.

14.  Defendant the United States Department of Defense, headquartered at 1400 Defense Pentagon, Washington, D.C. 20301-1440, is a department of the Executive Branch of

the United States Government. The BCNR is an organization within the office of the Secretary of the Navy, who is the head of the Department of the Navy. *See* 32 C.F.R. §§ 723.1 *et seq.*; Secretary of the Navy Instruction ("SECNAVINST") 5420.193. The Department of the Navy is a branch of the Department of Defense. The Department of Defense is an agency of the United States under the APA (5 U.S.C. § 701(b)(1)) and falls within the scope of 28 U.S.C. § 1391.

15.     In accordance with 28 U.S.C. § 2501, this action is brought within six years of the BCNR's decision denying relief.

## BACKGROUND

### I.     Military Discharge Procedures.

16.     Chapter 61 of Title 10 of the United States Code establishes the DES process through which all military departments may discharge disabled service members. It authorizes the retirement or separation of military personnel who are found to be unfit for continued military service due to physical or mental health related disability. *See* 10 U.S.C. §§ 1201–1222.

17.     Fitness for duty is governed by statute and the regulations set forth by the Department of Defense and the various military departments. Fitness focuses on whether a service member can reasonably perform the duties of their office, grade, rank, or rating. *See* 10 U.S.C. § 1201.

18.     The term "office" means a "position of duty, trust, authority to which an individual is appointed." DoDI1332.38 § E2.1.21.1.[1] The term "grade" means step or degree, in a graduated scale of office or military rank, that is established and designated as a grade by law or regulation. 10 U.S.C. § 101(b)(7). The term "rank" means the order of precedence among members of the armed forces. 10 U.S.C. § 101(b)(8). The term "rating" reflects an individual

---

[1] The term "officer" means a commissioned or warrant officer. *See* 10 U.S.C. § 101(b)(1).

service member's occupational field. 10 U.S.C. § 101(b)(9) ("The term 'rating' means the name

(such as 'boatswain's mate') prescribed for members of an armed force in an occupational

field."); DoDI 1332.38 § E2.1.21.4.[2]

19.    The Navy's DES process begins when a commanding officer refers a service

member for medical evaluation. *See* SECNAVINST 1850.4E §§ 3102, 3106.[3]

20.    After the referral, there are two main steps to the Navy's process for evaluating

disability retirement. First, a Medical Evaluation Board ("MEB") reviews the service member's

medical records and is charged with issuing a report that indicates whether the service member's

mental or physical conditions fail Navy retention standards and the specific reasons why the

service member does not meet retention standards. *See* DoDI 1332.38 §§ E4.A1.1.2.11.1–2.

21.    If the MEB determines that one or more of the service member's medical

conditions fail the retention standards, the member is referred to a PEB within DES. *See* DoDI

1332.38 § E4.A1.1.2.11.4. The PEB reviews the MEB's report, the service member's Non-

Medical Assessment ("NMA"),[4] along with any other relevant records, and determines whether

the service member has a disability that renders them unfit for military service. *See*

SECNAVINST 1850.4E §§ 3101-3209.

22.    The PEB process can include a review by an informal board, a formal board, and

appellate review, which in the Navy is conducted by the Naval Council of Review Boards

(formerly known as the Naval Council of Personnel Boards) for service members who have not

---

[2] The term "rate" means the name (such as "chief boatswain's name") for members in the same rating or other category who are in the same grade. 10 U.S.C. § 101(b)(9).
[3] *See* SECNAVINST 1850.4E §§ 3102, 3106.3
[4] The NMA is a statement from a service member's commanding officer that details how the service member's medical impairments have impacted the member's ability to function within the command. SECNAVINST 1850.4E § 11001. It is vital in assisting the PEB to make the proper determination of medically Fit or Unfit. *Id*.

yet been discharged or separated, and by the BCNR for service members who have been separated or retired. *See* SECNAVINST 1850.4E § 5001.

23.    A service member "shall be considered unfit when the evidence establishes that the member . . . is unable to reasonably perform the duties of his or her office, grade, rank, or rating ([also] called duties)[.]" DoDI 1332.38 § E3.P3.2.1; SECNAVINST 1850.4E § 3302(a).

24.    To determine whether a service member is unable to reasonably perform his duties, the PEB may consider the following general criteria, including whether the service member (1) has a medical condition that represents a decided medical risk to himself or to the welfare of other members, or (2) the medical condition imposes unreasonable requirements on the military to maintain or protect the member. DoDI 1332.38 § E3.P3.2.2; *see also* SECNAVINST 1850.4E § 3302(b)(1)–(2).

25.    Per DoDI 1332.38, determining whether a service member can reasonably perform his duties includes four relevant considerations, the first of which is whether the service member can reasonably perform the "common military tasks" of his office, grade, rank, or rating. DoDI 1332.38 § E3.P3.4.1.1; *see also* SECNAVINST 1850.4E § 3304(a)(1). These tasks depend on the occupation of the service member; for example, if a service member is routinely required to fire his weapon, perform field duty, or wear load bearing equipment/protective gear, the determination for this particular service member would look at whether he could reasonably perform those tasks. *Id*.

26.    The three other available considerations to determine whether a service member can reasonably perform his duties include: whether the service member can take and pass the required physical fitness test; whether the service member is deployable (if the service member's office, grade, rank, or rating requires deployability); and whether the service member's condition

causes loss of qualification for specialized duties. DoDI 1332.38 §§ E3.P.3.1.2–4; *see also*
SECNAVINST 1850.4E § 3304(a)(2)–(4).

27.     The PEB process has four possible outcomes. In particular, a service member can
be found:

        a.   fit for duty;

        b.   unfit for duty, but ineligible for disability benefits because, among other
            reasons, the disability condition was not incurred in the line of duty,
            existed prior to service, was the result of intentional misconduct or willful
            neglect, or was incurred during an authorized absence;

        c.   unfit for duty and eligible for medical retirement with monthly disability
            retirement pay and other benefits; or

        d.   unfit for duty and eligible for medical separation with one lump-sum
            severance payment.[5]

28.     If the PEB determines that the service member is unfit for military service,
meaning that his or her disability is an "unfitting condition" that prevents him or her from
reasonably performing his or her duties, then the PEB must assign a disability percentage in
accordance with the VA Schedule of Rating Disabilities. *See* 10 U.S.C. §§ 1201, 1203; National
Defense Authorization Act for Fiscal Year 2008, Pub. L. No. 110-181, § 1642(a), 122 Stat. 465,
codified at 10 U.S.C. § 1216a.; *see also* SECNAVINST 1850.4E §§ 3801-3805.

29.     Each unfitting condition is given its own rating, and the PEB assigns a combined
rating based on the sum of those individual ratings. If a service member's combined disability

---

[5] Service members who receive a disability rating of less than 30 are not eligible for medical
retirement and may instead be eligible for medical separation. *See, e.g.*, 10 U.S.C. §§ 1201,
1203.

rating is at least 30 percent, he or she is entitled to disability retirement and retirement benefits, including military health care for the service member and his or her family. 10 U.S.C. § 1201(a)–(b). A disability retiree is entitled, among other things, to military health care (TRICARE) for the retiree, the retiree's spouse, and the retiree's minor children; as well as access to military bases and commissary privileges. *Id.* § 1203(a)–(b); *see also id.* § 1212.

## II.    Byrd Develops Combat-Related PTSD Serving His Country.

30.    Noah Byrd served the United States Navy from 2005 through 2012 as an ADAN. As an ADAN, Byrd's primary duties involved maintaining aircraft engines and their related systems, conducting preflight aircraft checks, conducting periodic inspections and oil analysis on engines and engine-related systems, field-testing and adjusting engine and fuel system components, and supervising and providing training to power plant work centers. *See* Navy Personnel 18068F.

31.    During this period, Byrd consistently received evaluations showing that the meet or was above the standards for his role. In a July 13, 2006 evaluation, his commanding officer wrote that Byrd was a "self starting and motivated young airman" who "comes to work with a great attitude every day, always displaying good military bearing," and a "Hard Charger who provides above average customer service in the tool room while showing reliability in every task assigned." A year later, on August 6, 2007, his commander described him as "an invaluable asset to [his detachment] and a rising star with the HSL community." Byrd had "Astute Attention to Detail," was a "Devoted Worker" and a "Dedicated Team Player," and displayed "Unwavering Reliability" who was a "model for his peers." By that time he also had qualified as a plane captain and an ordinance team member. In June 2008, upon his advancement to Petty Officer Third Class, Byrd's commanding officer wrote that he "possesses the aptitude and determination

to exclude and be a leader in his rate." He was again identified as a "Team Player" with a "Solid Military Bearing" whose "exemplary uniform standards and outstanding military etiquette both on and off duty [were] an example for others to emulate." Further, he was "[t]rusted to complete the most difficult tasks in a timely manner" and was "confident in his ability to performance maintenance on the SH-60B helicopters." Finally, this June 2008 evaluation reported that Byrd had "[s]elfless devotion to duty" because he has "recently volunteered for Individual Augmentee duty to Iraq."

32.     Byrd then deployed to Iraq from 2008 through early 2009. While in Iraq, rather than serving as an ADAN, he served as a Detainee Guard responsible for the custody, accountability, and security of 3,000 high-threat national security detainees, including 250 of the "most ideologically extreme and high-risk detainees."

33.     Byrd continued to serve admirably, receiving superb reviews during his deployment to Iraq. His commander Byrd served in the "Navy's most demanding IA assignment." Yet Byrd earned nothing below an "above standards" mark, and his commander indicated he was the "#1 MP of 36 Third Classes" and showed "excellent in roles and responsibilities far beyond [his] peers in paygrade!" His commander recommended immediate promotion.

34.     Upon his return from Iraq, Byrd returned to his position working on aircraft. He was not provided with the requisite 30 days of leave after returning from the combat zone, but was immediately required to begin training to perform maintenance duties on F/A-18A-F and E/A-18G aircraft. His duties included performing scheduled and unscheduled maintenance on aircraft, and supervising and providing training to power plant work centers. His duties involved significant safety requirements related to taxiing, maintaining, and inspecting aircraft. This

required responsibility for following safety procedures for both the aircraft during maintenance and before flight. Significant risks, such as electrical or fuel fires, ground hazards, and other malfunctions, could occur if Byrd was not able to perform those duties. This was an extremely significant and stressful duty because numerous detailed steps and procedures need to be followed, checked, and verified to ensure that the aircraft is ready to fly. Even seemingly minor mistakes can result in serious, and potentially fatal accidents. These duties require extreme focus and attention to detail.

35.     Prior to his deployment to Iraq, Byrd was a plane captain for the helicopters on which he worked. After his return from deployment, Byrd was pressured to return to his roles as a plane captain, but now on a new type of aircraft. The plane captain is the last person, along with the pilot, to inspect a plane before takeoff, and thus the last check for important safety issues. The plane captain is responsible for documenting significant amounts of paperwork and ensuring procedures were followed, and is ultimately responsible for the safety of the plane.

36.     In addition, Byrd had additional duties, such as regular "duty days" with responsibility for monitoring safety where he was stationed.

37.     Byrd was stationed upon his return from Iraq at Fallon Naval Air Station in Nevada, a station that was in an isolated location and lacked services, reminding Byrd of Iraq.

38.     While serving in this role, Byrd began experiencing mental health difficulties, resulting in anxiety, poor sleep, and self-medication with alcohol. His self-medication escalated throughout 2009 and into 2010 and resulted in his engaging in various minor infractions. Despite this misconduct, Byrd was allowed to continue his service with non-judicial punishment that reduced him in rank to E-3 and required him to complete an Intensive Outpatient Program and he was placed on Limited Duty ("LIMDU"). For the first time, Byrd received a grade on his

evaluation below meeting standards. Even so, his command referred to him as a "proven hard charger" and had "every expectation that AD3 Byrd will put this incident behind him and press on."

39.     However, following his rank reduction, Byrd's mental health further decompensated. As a result, his treating psychologist referred him for inpatient treatment at Carson Tahoe Regional Healthcare Center in April 2010, where he remained for 6 days. Upon his discharge, Byrd was diagnosed with Major Depressive Disorder and Anxiety disorder NOS.

40.     Despite engaging in inpatient treatment and weekly therapy, Byrd's condition continued to deteriorate after his inpatient discharge. On July 5, 2010, Byrd's therapist again recommended that he be admitted to inpatient behavioral health services at Carson Tahoe Regional Healthcare because he was experiencing increased depression and suicidal ideation. After nearly 10 days inpatient, Byrd was discharged from Carson Tahoe Regional Healthcare Center with a diagnosis of Major Depressive Disorder and provisional PTSD.

**III.    Byrd's Mental Health Issues Result in Him Being Placed on Limited Duty.**

41.     Following his discharge from Carson Tahoe Regional Healthcare, Byrd continued to be placed on LIMDU for "Delayed" PTSD. Byrd's LIMDU prevented him from working on aircraft and on the flight line and recommended his attending more intensive outpatient therapy.

42.     Since the military installation where Byrd was stationed did not have the PTSD programming that he required, Byrd was scheduled for a complete psychiatric evaluation at Naval Medical Center San Diego in August 2010 so that he could eventually attend the intensive post-deployment PTSD program there. At his August 2010 appointment in San Diego, Byrd endorsed all PTSD symptoms "quite a bit and extremely except avoid[ance] . . . ." Byrd also indicated his mental health condition was disruptive to his work, social life, and family. His

treatment notes from this visit indicated that Byrd should relocate to San Diego for intensive outpatient PTSD therapy. In or around September 2010, Byrd transferred to the Naval Medical Center San Diego's Transient Personnel Unit in order to address his PTSD and depression through an intensive outpatient or residential program. At Naval Medical Center San Diego, Byrd no longer was assigned to work in his rate as an ADAN. Instead, Byrd worked as a "Front Desk Clerk" responsible for the operation of the front desk, proper check-in/out procedure of residents, room key control, and for submitted trouble calls. This job did not involve significant decision-making or responsibilities for the safety of others.

43.    Following Byrd's relocation to Naval Medical Center San Diego and his starting work as a Front Desk Clerk, Byrd still continued to experience significant PTSD symptoms. As a result, on November 5, 2010, Byrd was admitted to the OASIS Residential Treatment program for his PTSD, which was manifested by feelings of worthlessness, guilt, self-isolation, diminished ability to think or concentrate, distractibility, and panic attacks. After two weeks of residential treatment, and against the advice of medical professionals, Byrd disenrolled from inpatient treatment at OASIS because his severe PTSD behaviors impaired his judgement and prohibited meaningful engagement with the program.

44.    After his disenrollment, Byrd began working in the Recycle Unit at the Naval Medical Center San Diego and continued to endorse the following PTSD symptoms: physiological reactive to reminders of trauma, avoidance anhedonia, sleep problems, irritability, difficulty concentrating, hypervigilance, and increased startle response.

**IV.    Byrd is Referred to the Disability Evaluation System and Found Fit for Duty.**

45.    In February 2011, Byrd's medical providers determined that he was unlikely to return to full duty status, and he was referred into the DES.

46.     As part of the referral into DES, Byrd's commander filled out a non-medical
assessment. In that assessment, Byrd's commander reported that Byrd was not working in his
specialty because of his medical condition and that he could not perform at his rating. The
commander reported that Byrd was "scared to make any decisions" as a result of his anxiety
disorder and combat-related PTSD. His commander further contended that Byrd was unable to
continue in his work as an aviation machinist mate because "[b]eing able to make decisions is
part of his job saying that a plane is good and safe for someone to fly in and is a requirement of
an Aviation Machinist Mate, US Navy."

47.     Also, as part of the DES, Byrd was issued a MEB report in July 2011 by the
psychiatry resident who had been treating him and had originally diagnosed him with PTSD.
Shortly before issuing the MEB report, however, the resident physician changed Byrd's
diagnosis from PTSD and/or Anxiety Disorder NOS to "Adjustment Disorder with mixed
disturbance of emotion and conduct" with only mild military impairment and "Anxiety Disorder"
with moderate military impairment. The primary reason for this change, according to the MEB
report, was that Byrd: (1) could not readily identify "an index trauma" that caused his symptoms
but instead described the constant stress experienced during his time in Iraq and his witnessing of
inmate riots, fighting with crude weapons, and throwing of human bodily fluid, (2) his
neuropsychological testing indicating some exaggeration of symptoms, and (3) that symptoms
resolved during the period when he was on leave. Notably, no explanation was given as to how
Byrd could be suffering from adjustment disorder more than six months from his identified
combat-related stressors. Further, the MEB report relied on its conclusion that Byrd "has
displayed consistently [sic] difficulty complying with rules and regulations," but failed to not
that all these issues occurred after his deployment to Iraq and that, prior to that deployment he

was repeatedly singled out by his commanders as a model sailor, as described in his evaluations quoted above. This change in diagnosis was a significant factor in the ultimate decision to deny Byrd medical retirement. However, even this report noted that "it is clear that the patient is experiencing a number of symptoms that commenced during his time in Iraq . . . ."

48.     Byrd challenged the MEB's findings by requesting an Impartial Medical Review—that is, a request to have a second provider review the MEB opinion due to concern that this revised diagnosis wrongly cast doubt on the severity and legitimacy of Byrd's mental health disability. The physician who conducted this review expressed concerns about the change in diagnosis and recommended that the resident physician review the diagnosis and conclusively state whether Byrd's diagnosis included PTSD. But no change was made, and Byrd's case was referred to the PEB.

49.     While awaiting his PEB results, Byrd requested a new behavior health provider be assigned to his case. On September 8, 2011, while awaiting his PEB findings and the assignment of his new psychiatrist, Byrd reported to the Emergency Department with suicidal ideation. He was diagnosed with General Anxiety Disorder and "possible PTSD."

50.     In October 2011, an informal PEB found Byrd fit to continue Naval service. Byrd then requested a formal hearing to contest the informal PEB findings. While awaiting his formal hearing, Byrd began seeing a staff psychiatrist, a Commander in Navy, who was senior to the resident previously treating him. In preparation for Byrd's formal PEB, Byrd's new psychiatrist drafted a memo for the formal PEB.

51.     In this memo, the staff psychiatrist noted that, through review of Byrd's records and by meeting with Byrd in person, he concluded that Byrd did suffer from unfitting PTSD. The psychiatrist discredited the psychiatric resident's MEB report, stating that the report was affected

by "issues with communications between the provider and the patient. AN Byrd is often so anxious and busy thinking about what his response is to questions that he doesn't fully 'hear' what is being said to him. Also, his prior provider speaks English as a Second Language and there are times when it is difficult to understand him. In addition, the provider may have been unduly influenced by reports from the patient's [command] . . . at the time."

52.     The staff psychiatrist affirmed that Byrd's "mental status exams and interviews have been consistent with someone with PTSD which is related to his deployment working with detainees in Iraq." The psychiatrist further opined that Byrd "still has significant [PTSD] symptoms that impaired his daily functioning at work." He indicated that "[t]he patient has a very anxious mood, is feeling down, has some crying episodes, is isolating, and continues to have recurring upsetting memories of events in Iraq. . . . He still has extreme psychologic response with talking or thinking about his deployment. . . . He continues to have hypervigilance, startles easily, and has problems with concentration and sleep."

53.     The psychiatrist concluded his letter by stating that the Byrd was unfit for duty because his symptoms left him "not able to continue on active duty" because he could not "carry out his duties . . . and would never be suitable to be on a flight line with these symptoms."

54.     In addition to the letter from his psychiatrist, Byrd obtained a letter from his treating psychologist, who raised clinical questions about the MEB report's diagnosis because Byrd's symptoms had lasted longer than a year.

55.     On January 19, 2012, Byrd attended his formal PEB hearing, presenting his own testimony, his non-medical assessment, and the letters from his treating psychiatrist and psychologist.

56.     Despite this evidence, the formal PEB upheld the informal PEB's fit finding. In

its formal rationale, the PEB determined that the preponderance of the evidence did not support

that Byrd's PTSD was an unfitting condition. The evidence on which the PEB relied was

irrelevant to the fitness standards set forth in DoDI 1332.38. Specifically, the PEB found Byrd fit

for duty because "in the face of a stressful formal board," Byrd "presented himself before the

board well-groomed and dressed . . . alert and well oriented . . .talked and expressed himself in a

clear, coherent, and logical manner." The PEB also indicated that Byrd's "future career plans,

positive life outlook," and the discredited MEB report supported his fitness. Notably, the formal

PEB did not opine on how the above attributes demonstrated that Byrd could reasonably perform

the duties of his office, grade, rank, or rating.

57.    In finding Byrd fit, the PEB also erroneously opined that Byrd's continued service

would not pose a risk to him or others. In support of this conclusion, the PEB indicated that Byrd

did not need to serve as a "Plane Captain" as this was not essential to the ADAN rate. However,

fitness can include consideration of specialized duties and qualifications. And, in any event, there

was no evidence before the PEB that Byrd was able to perform even the most basic tasks

required by an ADAN. Shortly after the PEB finding, Byrd was at his mandatory separation date.

On February 21, 2012, he was found fit to separate.

**VI.    Byrd Appeals His Fit Finding to The BCNR Where Relief is Denied Twice.**

58.    Following his discharge, Byrd applied for VA benefits and was awarded a 100

percent disability rating for his PTSD alone, effective as of March 1, 2012. The VA

examinations supporting this rating were performed on April 20, April 28, and May 20, 2011,

before Byrd's separation. The VA noted numerous symptoms that accounted for this 100 percent

rating, including:

- Grossly inappropriate behavior,
- Difficulty in adapting to work,

- Difficulty in adapting to stressful circumstances,
- Inability to establish and maintain effective relationships,
- Near-continuous depression affecting the ability to function independently, appropriately, and effectively,
- Impaired impulse control,
- Difficulty in adapting to a work like setting,
- Unprovoked irritability with periods of violence,
- Occupational and social impairment, with deficiencies in most areas, such as work, school, family relations, judgment, thinking, or mood,
- Flattened affect,
- Difficulty in understanding complex commands,
- Difficulty in establishing and maintaining effective work and social relationships,
- Impairment of short- and long-term memory,
- Depressed mood,
- Mild memory loss,
- Chronic sleep impairment,
- Anxiety, and
- Mental condition has been formally diagnosed.

Further, the VA examiner provided a Global Assessment of Function score of 55, within the range for moderate symptoms or any moderate difficulty in social, occupational, or school functioning. This resulted in a 100 percent disability evaluation.

59.     In or around 2015, Byrd applied to the BCNR arguing that it was both an error and an injustice for him to be found fit and separated upon completion of his service, rather than provided medical retirement.

60.     On December 15, 2017, the BCNR issued a decision denying Byrd's application. It determined that there was "insufficient evidence" for a finding of unfitness because: (1) the PEB's description of Byrd's testimony and demeanor at the formal board hearing was "compelling evidence of . . . fitness of active duty," (2) Byrd's performance evaluations, including the one dated June 15, 2011, which he received while on limited duty and working as a Front Desk Clerk were positive, and (3) Byrd's 100 percent disability rating post discharge was "not probative" on the issue of fitness particularly because of the possibility of exaggerated

symptoms during testing as described in the 2011 MEB.

61.     Byrd then reapplied to the BCNR. This second application was denied on

September 17, 2021. This denial noted that the BCNR had "previously denied your request to be

placed on the disability retirement list based [on] the formal PEB hearing report, your

performance record that indicated you were able to perform military duties commensurate with

your paygrade and rate, and medical evidence that you may have been exaggerating your

symptoms." The BCNR concluded that the "PEB findings remain appropriate based on the same

rationale used by this Board in its previous decision."

**VII.    The BCNR's Decisions Were Arbitrary and Capricious and Violated Federal law.**

62.     The BCNR's decisions were arbitrary and capricious, unsupported by substantial

evidence, and contrary to law, because they failed to follow the requirements set by statute and

regulations for evaluating Byrd's claims. Had the proper standard been followed, Byrd's PTSD

would have been found to be unfitting at discharge with a 100 percent disability rating.

63.     10 U.S.C. § 1201 and DoDI 1332.38 establish the sole standards governing all

military fitness determinations. In pertinent part, they require that fitness determinations be based

on a service member's ability to reasonably perform the duties of their particular office, grade,

rank, or rate. These standards required the BCNR to: (1) establish the duties that a particular

service member of a particular grade and rank is reasonably expected to perform, and

(2) evaluate whether the service member's condition allows him or her to reasonably perform

such duties. *See Nyan v. United States*, 154 Fed. Cl. 463, 466 (2021).

64.     Consideration of reasonable performance further requires consideration of

whether Byrd's PTSD impacted his ability to perform common military tasks, deploy, complete

a physical fitness test, or perform required specialized qualifications. Further, in determining

fitness, DoDI 1332.38 provides that risk to the service member, to other service members, and the burden on the military be considered.

65.    Despite these clear mandates, the BCNR failed to set forth the duties that Byrd was required to perform as an ADAN and to consider whether, as a result of his PTSD, Byrd was able to perform his ADAN duties, his common military tasks, deploy, pass a physical fitness test, or perform his specialized duties as a Plane Captain. Had the BCNR engaged in such an analysis, it would have found that the preponderance of the evidence overwhelmingly supported the unfitness of Byrd's PTSD since it prevented him from: (1) performing basic ADAN duties, to include working on a flight line or on an aircraft; (2) completing common military tasks; (3) deploying; and (4) performing his specialized duties as a Plane Captain.

66.    The BCNR's decision also improperly applied the risk and burden analysis by concluding there was no risk to Byrd or others because Byrd no longer needed to serve as Plane Captain. This, however, did not demonstrate that Byrd could safely work as an ADAN without risk to himself or others, especially in light of his being scared to make decisions, his tendency to dissociate, his general inability to pay attention, and his requiring four inpatient hospitalizations in less than one year.

67.    The BCNR also erred by failing to give significant weight to the NMA written by Byrd's commanding officer. SECNAVINST 1850.4E encl 11, § 11001(d)(2), the instruction that implements DoDI 1332.38, requires that significant weight be given to the NMA. But the BCNR gave no weight – and in fact did not mention – the NMA written by Byrd's commanding officer which demonstrated that he could not perform his duties, let alone make a decision, as a result of his PTSD.

68.    The BCNR improperly relied on performance reports for Byrd from the time

period when he was working outside his rate as a Front Desk Clerk. In relying on these evaluations, the BCNR provided no evidence that the tasks required of a Front Desk Clerk are equivalent, or even similar, to those of an ADAN. In fact, those duties are plainly different.

69.     The BCNR also improperly based its fitness decision on criteria, such as Byrd's demeanor at formal PEB, his career plans, and life outlook, without explanation as to how—or if —those criteria relate to the considerations of fitness set forth by the law in DoDI 1332.38.

70.     The BCNR's determination that the VA exam was not probative to Byrd's fitness was also contrary to law. While fitness differs from VA compensation, a service member's VA rating and examination, if given close in time to discharge, provides relevant evidence of the service member's physical and mental limitation at the time of discharge and should not be excluded from determining fitness.

71.     For all these reasons, the BCNR's decisions were arbitrary, capricious, unsupported by substantial evidence, and contrary to law.

72.     Had the proper standards been applied, Byrd's PTSD would have been found unfitting at the time of his separation from the military. Upon such finding, 10 U.S.C. § 1216a and DoDI 1332.38 would have required the BCNR to adopt the VA's 100 percent PTSD disability rating. Such a rating, which is well above the required 30 percent rating, entitles Byrd to a medical retirement.

## COUNT 1
## VIOLATION OF ADMINISTRATIVE PROCEDURE ACT
## (5 U.S.C. § 706(2)(A))

73.     Plaintiff incorporates the allegations in paragraphs 1 through 72 above.

74.     The BCNR's decisions to affirm the PEB's finding that Byrd was fit for duty, not to find that his PTSD was unfitting with a disability rating of 100 percent is subject to judicial

review as a final "agency action" under the APA. 5 U.S.C. §§ 551(13), 701, 704; *Walls v. United States*, 582 F.3d 1358, 1367 (Fed. Cir. 2009) ("[I]t has become well established that judicial review of decisions of military correction boards is conducted under the APA.").

75.    Byrd's appeal to the BCNR was the final administrative option available to him for review of his fitness. He has no further administrative remedies for challenging the erroneous finding that he was fit for duty. He has made every attempt to resolve this conflict with the Department of Defense and has exhausted all possible administrative remedies.

76.    Under the APA, this Court must set aside a final agency action that is arbitrary, capricious, unsupported by substantial evidence, and abused of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A). The BCNR's decisions finding Byrd fit violated this provision of the APA.

77.    The BCNR acted arbitrarily, capriciously, without support of substantial evidence, and contrarily to law by affirming the PEB's decision and relying on irrelevant factors, such as Byrd's demeanor at formal PEB, his post-discharge career plans, his performance as a Front Desk Clerk, and his discredited MEB report, instead of applying the legal standard and analysis required by statute and regulation.

78.    Byrd has suffered a legal wrong as a result of the BCNR's arbitrary, capricious, unlawful, and factually unsupported fit finding. The BCNR's erroneous fit finding denied Byrd the medical retirement that his duty-limiting, combat-incurred PTSD warranted.

79.    As a result of the BCNR's decisions, Byrd was, and continues to be, deprived of the benefits of the medical retirement to which he is entitled. He should be awarded that retirement.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Noah Byrd respectfully requests that this Court enter judgment against the Defendant and enter an order that:

1.      Declares and finds the BCNR's final decision arbitrary and capricious, unsupported by substantial evidence, and contrary to law;

2.      Sets aside those decisions under 5 U.S.C. § 706(2)(A);

3.      Orders that the Secretary correct Byrd's military records—including without limitation his DD Form 214 and his retirement orders—to reflect a permanent medical retirement;

5.      Awards Plaintiff all costs, interests, and reasonable attorneys' fees;

6.      Awards such other relief that the Court may deem just and proper.


Dated: May 25, 2023                      FAEGRE DRINKER BIDDLE & REATH
                                          LLP


                                          */s/ Nickolas Merrill*
                                          Nickolas I. Merrill (#1781099)
                                          1500 K Street, Suite 1100
                                          Washington, D.C. 20005
                                          T: 1 + (202) 842-8800
                                          F: 1 + (202) 842-8465
                                          nickolas.merrill@faegredrinker.com

                                          *Attorney for Plaintiff*
                                          *Noah Byrd*