UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NOAH T. BYRD,

    *Plaintiff*,

v.

DEPARTMENT OF DEFENSE,

    *Defendant*.

Civil Action No. 23-1512 (TJK)

**MEMORANDUM OPINION**

    While serving in the Navy for over six years, Noah Byrd worked mainly in aircraft maintenance as an Aviation Machinist's Mate. In 2008, however, he deployed to Iraq to guard high-risk detainees. After returning from that post, he began experiencing Post-Traumatic Stress Disorder symptoms and incurring misconduct violations. Byrd's doctors eventually referred him to the Navy's system for evaluating disabilities and assessing whether a member is unfit to keep serving. The evaluation board found that Byrd was fit, rendering him ineligible for disability-based retirement benefits. Byrd unsuccessfully appealed that decision to a review board. He then sued the Department of Defense under the Administrative Procedure Act, alleging that the review board's decision was, among other things, arbitrary and capricious.

    Although the review board is entitled to significant deference, it must—like other agencies—provide a rational explanation for its decision. Part of providing such an explanation is engaging with significant evidence that cuts against the agency's conclusion. The review board failed to do that here because it never addressed assessments from two officers that favored Byrd's claim that he was unfit for his duties. The Court will therefore grant Byrd's motion for summary judgment, deny the Department's motion, and remand to the review board for further

consideration.

**I.     Background**

    **A.     Legal Background**

The Secretary of the Navy may retire or separate a member from service if he determines that the member is "unfit to perform the duties of the member's office, grade, rank, or rating." 10 U.S.C. §§ 1201(a), 1203(a).  If an unfit servicemember receives a disability rating of 30% or greater, he becomes eligible for "retired pay" according to a statutory schedule.  *Id.* § 1201(a), (b)(3).  But an unfit member who receives a rating of under 30% is eligible only for "severance pay."  *Id.* § 1203(a), (b)(4); *see generally Jones v. Dep't of Defense*, 22-cv-1513 (TNM), 2023 WL 3863800, at *1 (D.D.C. June 7, 2023).  For either benefit, a member must first establish the existence of a "qualifying disabilit[y]" that causes the unfitness for duty.  *See Blount v. Del Toro*, 21-cv-2446 (TJK), 2024 WL 1091743, at *1 (D.D.C. Mar. 12, 2024).

The Navy assesses disabilities and fitness under the "Disability Evaluation System."  *See generally* SECNAV INSTRUCTION 1850.4E, available at https://perma.cc/U9EV-2TCG; *see also Blount*, 2024 WL 1091743, at *1–2.  During the relevant timeframe, the Navy instructions for this system explained that "[a] case usually enters" the system after a Medical Evaluation Board ("MEB") "evaluate[s] the diagnosis and treatment of a member."  SECNAV INSTRUCTION 1850.4E encl. 3, § 3102(a).  And "[a]ny condition that appears to significantly interfere with" a servicemember's "performance of duties . . . will be considered for MEB evaluation."  *Id.* encl. 8, § 8001(e).  Medical treatment facilities may refer the MEB report to the Physical Evaluation Board ("PEB"), but "[u]nder no circumstances" is that report "to indicate that the member is Unfit."  *Id.* encl. 8, attachment A, § 2(k)(2).

Instead, that is the province of the PEB, which "acts on behalf of [the Secretary] to make determinations of Fitness to continue naval service."  SECNAV INSTRUCTION 1850.4E § 4(a);

*see also id.* encl. 8, attachment A, § 2(k)(2). "The sole standard" for this fitness assessment is whether the servicemember "is unfit[] to perform the duties of [his] office, grade, rank or rating because of disease or injury." *Id.* encl. 3, § 3301. Those "duties" include common military tasks for that member's position; for instance, if the servicemember's rating requires him to "fire his . . . weapon, perform field duty, or . . . wear load bearing equipment," the assessment should account for those duties. *Id.* encl. 3, § 3304(a)(1). The ultimate question is not whether a doctor has diagnosed the servicemember with a condition. Instead, the fitness inquiry asks whether that condition "actually interferes significantly with the member's ability to carry out the duties of his . . . office, grade, rank or rating." *Id.* encl. 1, § 1004(c)(2)(a). And in making this determination, the PEB should "[c]onsider all relevant evidence." *Id.* encl. 3, § 3303.

PEB decisions are subject to an appeals process. The Secretary of the Navy "may correct any [Navy] record" when he "considers it necessary to correct an error or remove an injustice." 10 U.S.C. § 1552(a)(1). To this end, the Navy has established the Board for Correction of Naval Records ("the Board"), *see* 32 C.F.R. §§ 723.1, 723.2(a), which considers applications from current and former members of the Navy to determine "the existence of error or injustice in the naval records," *id.* § 723.2(b). If the Board denies an application for correction, it must "include a statement of the grounds for denial." *Id.* §§ 723.3(e)(3)–(4), 723.6(a)(3). After this "final adjudication," the Board will "further consider[]" an application only if the applicant shows "new and material evidence or other matter not previously considered." *Id.* § 723.9.

**B.     Factual Background**

In 2005, Byrd began serving as an Aviation Machinist's Mate, a position also referred to as "AD" or "ADAN" in the administrative record. *See* AR 52, 96. His duties in that role focused on aircraft maintenance. Specifically, Byrd inspected and maintained aircraft engines and related systems, performed field-testing on engine and fuel-system components, assessed and repaired

3

"engine, fuel[,] and secondary power system[s] and components," and supervised and trained power plant work centers.  AR 131.

Byrd received strong performance reviews for his work in this role from 2005 through 2008.  His earliest review explained that he "is a self[-]starting and motivated young airman" who "striv[es] to excel in all tasks assigned."  AR 40–41.  In his next review, the reporting officer described him as "an invaluable asset" and "rising star."  AR 42–43.  And in 2008, his reviewer praised Byrd for "possess[ing] the aptitude and determination to excel and be a leader in his rate."  AR 44–45.

Byrd deployed to Iraq that same year to work as a guard for about "3,000 high-threat national security detainees."  AR 69.  He performed this "demanding" work exceptionally well, including by mentoring his peers, ensuring compliance with operating procedures, and "[m]eticulously prepar[ing] and direct[ing] his team."  AR 70.  But the conditions were grueling.  Byrd "personally interact[ed] with detainees 12 hours daily during 6 days each week."  AR 70.  Further, a Navy staff psychiatrist who treated Byrd beginning in late 2011 reported that he witnessed riots, detainee attacks, the "throwing [of] bodily fluids," alarms, and indirect fire.  AR 139–40; *see also* AR 190.

Following his return from Iraq in mid-2009, Byrd returned to his work in aircraft maintenance as an Aviation Machinist's Mate.  AR 82.  He performed adequately during his first few months back, but in November 2009 he picked up several misconduct violations—failure to obey an order or regulation, assault, and drunken disorderly conduct—that resulted in a pay reduction and other penalties.  AR 83.  Although his command expected Byrd to "put this incident behind him," AR 83, he committed other infractions in March 2010, AR 88.  After that incident, Byrd's officer-in-charge noted that his "irresponsible use of alcohol" was a "deficienc[y] in [his]

4

performance." AR 89.  Byrd's clinical social worker believed that he needed inpatient treatment, and in April 2010 he was hospitalized at a behavioral health clinic.  AR 157–58.  About three months later, she again sought to "facilitate voluntary inpatient treatment" because she thought that Byrd was "experienc[ing] acute PTSD."  AR 158.

Byrd was eventually transferred to Naval Medical Center San Diego in August 2010.  AR 113.  There, he participated in a PTSD program for two weeks but failed to complete it.  AR 113.  The medical center also performed an initial psychiatry evaluation, in which Byrd said he was experiencing, among other symptoms, jumpiness, insomnia, poor concentration, fatigue, and "disturbing memories" of his time in Iraq.  AR 190.  While in San Diego, Byrd worked part-time as a front-desk clerk at the medical center starting in November 2010.  AR 94–95, 127.  His job included controlling room keys, submitting trouble calls, and ensuring compliance with check-in and check-out procedures.  AR 94–95.  Byrd performed this work well, receiving average to above-average scores on his performance review.  *Id.*

In July 2011, Byrd's MEB report diagnosed him with "Adjustment Disorder" and "Cluster B personality Disorder."  AR 122–23.  Before then, Byrd had carried a PTSD diagnosis.  AR 154.  The MEB report, however, noted that testing "indicate[d] that there is a suggestion of exaggerating psychiatric symptoms."  AR 120.  And although testing also "confirm[ed] that [Byrd] is experiencing many symptoms associated with a diagnosis of [PTSD]," Byrd reportedly lacked an "index trauma," so he "better fit[] a diagnosis of Adjustment Disorder."  AR 121.  Byrd requested a second opinion, which noted a "diagnostic misalignment" between this evaluation and a previous Veterans Affairs report.  AR 155.  The doctor providing the second opinion thought that the MEB report's authors adequately addressed the changed diagnosis but still requested that they "review the diagnosis once more" to state whether it should include PTSD.  *Id.*

As part of the disability evaluation process, Byrd's commanding officer also submitted the required Non-Medical Assessment—a "major component of the Physical Evaluation Board's . . . adjudication." AR 126; *see also* SECNAV INSTRUCTION 1850.4E encl. 1, § 1001(k) (Non-Medical Assessments are "*crucial* in summarizing the member's limitations from the perspective of the commanding officer."). According to that report, Byrd lacked "good potential for continued service in his . . . present physical and mental condition[.]" AR 127. Byrd said he wanted to continue his service, but his commanding officer stated that Byrd "can no longer be an ADAN" because he is "scared to make any tough . . . decisions"—a "requirement" for that rate. AR 128.

The PEB determined that Byrd was fit to continue service during an informal hearing in October 2011. AR 130. After that finding, Byrd's staff psychiatrist—Navy Commander Reina—wrote the PEB twice to express her disagreement with the MEB report's conclusions. AR 139–144. She noted that Byrd's symptoms worsened when he was in the military environment and that he struggled to listen and follow directions. AR 140, 143. He also startled easily, had trouble concentrating and sleeping, and generally experienced hypervigilance. *Id.* All these symptoms, she explained, rendered him incapable of "carry[ing] out his duties." *Id.*

About three months later, the PEB affirmed the fitness determination in a formal proceeding. *See* AR 130–32. Byrd's relevant duties, the PEB found, included aircraft maintenance, engine field-testing, and system inspections. AR 131. But his PTSD—which the MEB report had concluded was better diagnosed as adjustment disorder—did not significantly interfere with Byrd's ability to perform those duties. *Id.* The PEB reasoned that Byrd's "demeanor" during the hearing showed that he was "alert," "well oriented," "confident," and "assertive." *Id.* His "positive life outlook" also contributed to the PEB's fitness determination, as did the MEB report. *Id.* Weeks later, Byrd was discharged for completion of his required active service. AR 203.

Byrd appealed the PEB's decision to the Board, which appeared to credit—and did not dispute—that Byrd had "mental health conditions, including . . . PTSD." AR 105–06. Still, the Board denied his appeal in 2017 for several reasons. First, the Board rejected Byrd's argument that the "VA's 100% rating of [his] PTSD condition" meant that the PEB erred in finding him fit. AR 106. The PEB's determination hinged on Byrd's fitness for ADAN duties, so the VA rating—which did *not* require that inquiry—did not undermine that decision. *Id*.

Second, the Board agreed with the PEB's conclusion that the evidence did not show that Byrd was unfit for ADAN duties. Byrd's demeanor, "positive life outlook," and "future career plans" at the PEB hearing constituted "compelling evidence of [Byrd's] fitness for active duty." AR 106. That evidence aligned with Byrd's performance reviews, which never said that he was incapable of performing ADAN duties. *Id*. Finally, the Board credited the MEB report's analysis of the testing that suggested Byrd exaggerated some psychiatric symptoms, apparently concluding that Byrd's demeanor at the PEB hearing corroborated that testing. *Id*. Byrd requested reconsideration several years later, claiming that his chain of command and mental-health provider colluded against him. In September 2021, the Board rejected that argument and reiterated that the "PEB findings remain appropriate based on the same rationale used by this Board in its previous decision." AR 201.[1]

Byrd eventually sued under the APA, arguing that the Board's decision was arbitrary and capricious, unsupported by substantial evidence, and contrary to law. *See* ECF No. 1, ¶ 77. Both parties moved for summary judgment. *See* ECF Nos. 14, 19.

---

[1] The parties focus on the 2017 Board decision, presumably because the 2021 decision concluded that the "PEB findings remain appropriate based on the same rationale" in the 2017 decision. AR 201. The Court follows their lead, so references to the Board's decision refer to the 2017 decision unless otherwise indicated.

7

II.     **Legal Standards**

Although the parties seek summary judgment, the ordinary summary-judgment standard does not apply.  Byrd challenges "agency action under the APA," so the Court "sits as an appellate tribunal."  *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001).  That is, because the case presents "a question of law," the Court has no factfinding role.  *See id.*  It must ask "whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review."  *Citizens for Resp. & Ethics in Wash. v. SEC*, 916 F. Supp. 2d 141, 145 (D.D.C. 2013).  On top of its purely procedural requirements, the APA directs courts to "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

When evaluating a claim that an agency has acted arbitrarily or capriciously, a court must ensure that the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action."  *FCC v. Fox Television Stations*, 556 U.S. 502, 513 (2009) (citation omitted).  That standard does not empower a court to "substitute its judgment for that of the agency."  *Id.* (citation omitted).  But it does require that the agency provide a "rational connection between the facts found and the choice made."  *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation omitted).  And if that connection is missing, a court "may not supply a reasoned basis for the agency's action that the agency itself has not given."  *Id.* (citation omitted).[2]

---

[2] The parties dispute whether the Court may review the Board's decision under the substantial-evidence standard.  That "debate is of little consequence," though, because "[w]hen the arbitrary or capricious standard is performing th[e] function of assuring factual support, there is no *substantive* difference between what it requires and what would be required by the substantial evidence test."  *Open Soc'y Inst. v. U.S. Citizenship & Immigr. Servs.*, 573 F. Supp. 3d 294, 316 (D.D.C. 2021) (quoting *Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Governors of Fed.*

The Board is entitled to "an unusually deferential application of the 'arbitrary or capricious' standard." *McKinney v. Wormuth*, 5 F.4th 42, 45 (D.C. Cir. 2021) (per curiam) (citation omitted). Congress provided the Secretary with a "broad grant of discretion" under § 1552, which permits him to correct Navy records when he "considers it necessary to correct an error or remove an injustice." *Roberts v. United States*, 741 F.3d 152, 158 (D.C. Cir. 2014) (quoting *Kreis v. Sec'y of Air Force*, 866 F.2d 1508, 1514 (D.C. Cir. 1989), and § 1552(a)(1)). That is why the Court's review asks whether "the Board's decisionmaking process was *deficient*, not whether its decision was *correct*." *McKinney*, 5 F.4th at 46 (citation omitted) (cleaned up).

But that deference is not a "rubber stamp of approval." *Foreman v. Dep't of Navy*, 18-cv-367 (TJK), 2019 WL 3767117, at *5 (D.D.C. Aug. 9, 2019) (citation omitted). "[T]he Board's action must be supported by 'reasoned decisionmaking,'" *Haselwander v. McHugh*, 774 F.3d 990, 996 (D.C. Cir. 2014) (citation omitted), which a court may assess "without venturing beyond the conventional judicial function," *Kreis*, 866 F.2d at 1514. In other words, the Board "must give a reason that a court can measure, albeit with all due deference, against the 'arbitrary or capricious' standard." *Pettiford v. Sec'y of Navy*, 774 F. Supp. 2d 173, 182 (D.D.C. 2011) (quoting *Kreis*, 866 F.2d at 1514). That is why the Board's decision passes muster if the Board "reasonably reflected upon the information contained in the record and grappled with contrary evidence," *McKinney*, 5 F.4th at 47 (citation omitted) (cleaned up), and also why the Board's "failure to address a non-frivolous argument . . . that could affect [its] ultimate disposition renders [the] decision arbitrary and requires a remand," *Pettiford*, 774 F. Supp. 2d at 185 (collecting cases). Put differently, remand is appropriate when the Board "fail[s] to grapple with what appears to be a substantial

---

*Rsrv. Sys.*, 745 F.2d 677, 683–84 (D.C. Cir. 1984)). Further, the Court's holding rests on the Board's deficient *explanation* and does not address the sufficiency of the factual record itself.

9

issue," because in that situation the reviewing court cannot assess whether the Board's decision "was a proper exercise of its discretion." *Roberts v. Harvey*, 441 F. Supp. 2d 111, 122 (D.D.C. 2006).

### III.    Analysis

The parties spar over many discrete aspects of the Board's decision. For example, they debate whether the Board should have construed Byrd's claim liberally, *see* ECF No. 23 at 17; ECF No. 24 at 18, and whether it needed to assess the burdens that Byrd's continued service would impose on the Navy, *see* ECF No. 19-1 at 28; ECF No. 23 at 3–4. But this dispute is narrower than their briefing suggests. As Defendant acknowledges, "the Board did not dispute [Byrd's] PTSD diagnosis, only his unfitness." ECF No. 23 at 13 (citing AR 106); *see also id.* at 15 ("[T]he Correction Board expressly acknowledged Plaintiff's 'PTSD and other mental health conditions.'" (citing AR 106)). Both parties—as well as the Board and PEB, *see* AR 106, 131—also agree that Byrd's "rate" of Aviation Machinist's Mate supplies the duties that anchor his fitness assessment. *Compare, e.g.*, ECF No. 14-1 at 19 (arguing that the Board "reasonably relied on . . . [Byrd's] job duties as an Aviation Machinist's Mate"), *with* ECF No. 19-1 at 26 (arguing that the Board needed to consider "the duties of an Aviation Machinist's Mate"). Given these premises, the Court finds one question dispositive: did the Board "articulate[] a satisfactory explanation for its action" by "grappl[ing] with"—even if only briefly—Byrd's "evidence that he was" unfit for his duties as an Aviation Machinist's Mate? *Albino v. United States*, 78 F. Supp. 3d 148, 164, 167 (D.D.C. 2015) (citation omitted)

The Board did not clear this low bar. In explaining its decision, the Board never mentioned either the report of Byrd's commanding officer or Commander Reina's assessment, significant evidence that suggested Byrd was unfit.

Commander Reina's assessment explained that Byrd continued to struggle with symptoms

and was thus "not able to carry out his duties."³  AR 140.  According to her assessment, Byrd had problems "listening and following directions," and he suffered an "extreme physiologic response" when "talking or thinking about his deployment." *Id*.  More generally, Byrd "still ha[d] significant symptoms impairing his daily functioning at work" as of January 2012.  *Id*.  The Board needed to assess whether the PEB erred by deeming Byrd fit to perform his ADAN duties, so this Navy psychiatrist's opinion detailing his symptoms raised a "substantial issue" that the Board "failed to grapple with."  *Roberts*, 441 F. Supp. 2d at 122.

Compounding this deficiency, the Board never addressed the report of Byrd's commanding officer.  Byrd, according to this assessment, lacked "good potential for continued service in his . . . present physical and mental condition."  AR 127.  Byrd's commanding officer explained that his condition "caus[ed] him to be scared to make any decisions."  *Id*.  And because making those decisions is "part of his job" and a "requirement of an Aviation Machinist Mate," the commanding officer concluded that Byrd "can no longer be an ADAN."  AR 128.

This hole in the Board's reasoning is especially problematic because the commanding officer's report is "a major component of the [PEB's] adjudication" of fitness.  AR 126.  Indeed, "[g]iven the disability evaluation system's emphasis on performance," this report is "critical in portraying a service member's limitations" and "highlight[ing] the sailor[']s . . . ability/inability

---

³ Commander Reina addressed this memorandum to the PEB.  But the Board said that it considered "all material submitted in support" of Byrd's application, as well as "relevant portions of [his] naval record."  AR 105.  Defendant interprets this recitation to mean that the Board "considered all of Plaintiff's service and medical records."  ECF No. 23 at 14.  For its part, the PEB said that it considered the "memo provided by CDR B.J. H. Reina," AR 130, so "relevant portions" of Byrd's naval records would seem to cover evidence that the PEB acknowledged as part of the record.  In any event, Defendant has not argued that this report was somehow not before the Board, thereby "waiv[ing] any . . . argument" to that effect.  *Ass'n of Am. Railroads v. U.S. Dep't of Transp.*, 821 F.3d 19, 26 (D.C. Cir. 2016).  That's especially so here because Defendant *did* argue that Byrd waived a *different* argument by not raising it before the Board.  *See* ECF No. 23 at 4.

to execute duties as required of his . . . rating/rank." SECNAV INSTRUCTION 1850.4E encl. 1, § 1001(k). That is why the report "*greatly assists* the voting members in determining the Fit/Unfit potential of the member," *id.* (emphasis added), and "is vital to the timely, fair, and transparent determination of whether a member is Fit or Unfit," AR 126. Despite the "significant weight" that relevant regulations say must be given to this report, it was entirely absent from the Board's explanation for its decision. *Nyan v. United States*, 153 Fed. Cl. 234, 244–45 (2021) (fitness determination was "inconsistent" with Navy standards where the PEB offered "no explanation" for not heeding the recommendations of the commanding officer's report), *vacated in part on other grounds by* 154 Fed. Cl. 463 (2021). This "silence is especially troubling" because the Board also did not "respond[] to" Commander Reina's assessment, which was also "favorable to" Byrd's claim of unfitness. *Homer v. Roche*, 226 F. Supp. 2d 222, 226 (D.D.C. 2002).

In part because of these omissions, this is not a case where "the agency's path may reasonably be discerned." *Pettiford*, 774 F. Supp. 2d at 182 (citation omitted). None of the Board's stated reasons—individually or collectively—explain why the Board upheld the fitness determination despite these two unmentioned reports. Consider the Board's rejection of Byrd's argument that his VA disability rating showed he was unfit. Even assuming the Board's reasoning was correct, negating that evidence says nothing about whether the assessments of Byrd's commanding officer and Commander Reina were enough to establish unfitness.[4]

---

[4] Byrd emphasized the VA rating in his application for correction. *See* AR 109. But he also said more generally that the PEB incorrectly found that he was fit for duty and that his primary provider did not properly evaluate his conditions. Although Defendant does not press this point, the Court does not read Byrd's application as focused exclusively on the VA rating at the expense of his other claims. Byrd made clear that he thought the PEB wrongly deemed him fit, and the application form leaves little room for arguments more specific than that. *Id*. And "even if" he did not "expressly" make the "specific arguments" about the assessments from his commanding officer and Commander Reina, those reports are central to the question before the Board: whether

So too for the Board's reliance on Byrd's performance evaluations through June 2011. The positive evaluations predating his time in Iraq do not show that Byrd was fit for ADAN duties despite his *post*-deployment symptoms. As for the first two reviews after his return, they rated Byrd as adequate—a downward trend following Iraq—but highlighted the misconduct problems that led to PTSD treatment and his role as a front-desk clerk. *See* AR 82–86. And although Byrd received a positive third evaluation for his work in that administrative role in 2010 and 2011, *see* AR 94–95, his oversight of "room key control" and check-in procedures is not self-evidently probative of his ability to "maintain[]," "field-test," and "troubleshoot" aircraft engines while also performing periodic preflight inspections. AR 94, 131. The Board may have concluded that something about these performance reviews outweighed or discredited the reports of Byrd's commanding officer and Commander Reina. But by "not even mention[ing], much less grappl[ing] with," those reports, the Board has left the Court and Byrd "to scratch their heads as to why [it] found [Byrd's] evidence unpersuasive." *Albino*, 78 F. Supp. 3d at 167–68 (citation omitted).

What about the Board's consideration of Byrd's demeanor and the testing that suggested he exaggerated symptoms? AR 106. This rationale suffers from the same problem: it does not explain why the Board discredited or found unpersuasive the unmentioned assessments. Pointing to Byrd's ability to compose himself for a single hearing does not by itself explain why those reports—provided by Navy officers who had observed Byrd for longer periods—failed to establish unfitness. Nor does highlighting the MEB report's statement that testing "indicates that there is a suggestion of exaggerating psychiatric symptoms." AR 120. For one thing, the Board failed to mention the MEB report's note that "[t]esting" also "*confirm[ed]* that the patient *is experiencing*

---

the PEB erred in its fitness finding. *Haselwander*, 774 F.3d at 997 (specific arguments "may still be raised on appeal if the agency 'reasonably should have understood the full extent of [the petitioner's] argument'" (citation omitted)).

many symptoms associated with a diagnosis of [PTSD]." AR 121 (emphases added). For another, even assuming the Board—given the testing and Byrd's demeanor—thought that Byrd had hoodwinked his commanding officer and Commander Reina with exaggerated symptoms, the Board never said that. And if it "cho[se] to disregard" these reports, the Board needed to "expressly indicate that it ha[d] done so," *Rudo v. Geren*, 818 F. Supp. 2d 17, 26 (D.D.C. 2011) (citation omitted), especially given the importance of the commanding officer's assessment. Without that explanation, "neither the plaintiff nor [the] court [may] discern whether the [Board] considered and was unpersuaded by" the evidence or whether it "simply excluded [it]" for a particular reason. *Id.* (citation omitted). That is the hallmark of a "decision making process [that] was deficient." *Piersall v. Winter*, 435 F.3d 319, 322 (D.C. Cir. 2006) (citation omitted).

Defending the Board's decision, Defendant tries to fill the gaps in its explanation with after-the-fact rationalizations. For example, Defendant argues that the Board gave the commanding officer's assessment "appropriate weight" because that report (i) noted that Byrd passed a physical test and said he was willing to be a motivated sailor, and (ii) wrongly conflated Byrd's ADAN duties with the specialized duties of a plane captain. ECF No. 14-1 at 11–12; ECF No. 23 at 8. But "[w]hatever the merits of these post-hoc justifications, they were not contained in the [Board's] decision and thus cannot be considered by this Court." *Albino*, 78 F. Supp. 3d at 168. It is a "fundamental rule of administrative law" that courts must evaluate agency action "solely by the grounds invoked by the agency"—not Defendant's belated effort to "provide the missing explanation" in summary-judgment briefing. *Poole v. Harvey*, 571 F. Supp. 2d 120, 126 (D.D.C. 2008) (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)). Even putting aside that defect, Defendant's explanation rests on a strained reading of the commanding officer's assessment, which states that Byrd does not "have good potential for continued service." AR 127. More to

the point, the commanding officer said that Byrd's condition makes him "scared to make any tough" decisions—a "requirement" for serving as "an Aviation Machinist Mate." *Id*.

Defendant also asserts that Byrd "fails to respond at all to" these arguments in his briefing and has thus "conceded them." ECF No. 23 at 7. Far from it. Byrd argued that the Board "ignored—*without explanation*—the voluminous evidence that supported his claim." ECF No. 19-1 at 24 (emphasis added). Specifically, he contended that the Board needed "to *actually discuss* [the commanding officer's report] and give weight to the conclusion" that Byrd was scared to make decisions and thus could not serve as an ADAN. *Id.* at 29–30 (emphasis added). In any event, it is irrelevant whether Byrd "conceded" an argument about the adequacy of an explanation that the Board itself did not provide, because that missing explanation cannot save the Board's deficient decision-making process.

Nor does Defendant move the needle by pointing out the Board's acknowledgment of the commanding officer's assessment in its "Chronology of Relevant Events." AR 113. The chronology is an "administrative record" that was not part of the Board's written decision, *id.*, which must "include the *reasons* for the determination that relief should not be granted," 32 C.F.R. § 723.3(e)(4) (emphasis added). And "it is not enough for the [Board] simply to identify" an important piece of evidence favoring Byrd's claim "without responding to [it], either by addressing" the evidence "or explaining why [the evidence] need not be addressed." *See Albino*, 78 F. Supp. 3d at 167. Here, the Board's chronology said only that Byrd's commanding officer "states Petitioner has been experiencing constant disciplinary problems since 2009." AR 113. Absent from that "fleeting reference[]" is any engagement with the report's substance. *Getty v. Fed. Sav. & Loan Ins. Corp.*, 805 F.2d 1050, 1055 (D.C. Cir. 1986) ("Stating that a factor was considered . . . is not a substitute for considering it."). More importantly, the Board did not even purport to

15

consider the key conclusion of the assessment—that Byrd could no longer be an ADAN. On this record, then, the Court "simply do[es] not know whether" the Board reasonably discounted the commanding officer's assessment, so its decision "was arbitrary and capricious." *Nat'l Treasury Emps. Union v. Horner*, 854 F.2d 490, 499 (D.C. Cir. 1988).

Defendant has less to say about Commander Reina's assessment, which Byrd argues is favorable evidence that the Board ignored without explanation. Conceding that the Board did not "expressly mention" that report, Defendant contends that this silence is unsurprising because the Board disputed Byrd's unfitness—not his PTSD diagnosis—and because the report was consistent with the testing reflecting some exaggerated symptoms. ECF No. 23 at 13–14. In other words, Defendant asks the Court to assume that the Board dismissed Commander Reina's opinion for those reasons. But that request runs headlong into the "basic rule" that "[a]n agency must defend its actions based on the reasons it gave when it acted." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 24 (2020). At any rate, Defendant's reading of the report is cramped. Commander Reina said that Byrd's symptoms rendered him "not able to continue on active duty" or "carry out his duties as an AN." AR 140. And her assessment of unfitness *accounted for* the potentially exaggerated symptoms, so it casts doubt on rather than supports the Board's reliance on that testing as a basis for finding Byrd fit. Again, the Board need not have credited this report or found it more persuasive than the other evidence; perhaps the Board had good reason to dismiss it. But with no explanation from the Board, the Court cannot assess its reasoning and thus cannot uphold its decision. Remand is therefore appropriate. *See Pettiford*, 774 F. Supp. 2d at 185.

It bears repeating that the Court is evaluating the Board's decision-making process, not the correctness of its decision. The Court does not hold that the Board needed to credit these two reports favoring unfitness or determine that they outweighed the evidence suggesting that Byrd

16

was fit.  But the Board did need to explain, at least briefly, why it reached the conclusion it did despite these two material assessments that suggested that Byrd was not fit.  Because the Board said nothing to that effect, the Court "cannot determine whether the Board[]" reasonably exercised its considerable discretion.  *Roberts*, 441 F. Supp. 2d at 122.  On remand, the Board may ultimately decide that the reports of Byrd's commanding officer and Commander Reina are insufficient to show that Byrd is unfit.  But it "will have to articulate its reasons for doing so."  *Id.*

Finally, a brief word on remedy.  Defendant says that the Court should simply remand the case to the Board for further consideration of Byrd's fitness.  For his part, Byrd seeks more than that; he asks for an order compelling the Board to place him on the "Permanent Disability Retired List as of 2012" and give him a "100 percent disability rating as established by the VA."  ECF No. 1, ¶ 8.

The appropriate remedy is remand so that the Board can further consider Byrd's fitness and explain its evaluation of the evidence that was before it, including the assessments of Byrd's commanding officer and Commander Reina.[5]  As discussed, the Court has considered whether the Board's "decision making process was deficient, not whether [it] was correct."  *Piersall*, 435 F.3d at 322 (citation omitted).  That review fits comfortably with the deference owed to Board decisions.  After all, the Court does not "substitute its judgment for that of the [Board]" so long as the relief is "only [to] require the [Board], on remand, to explain more fully the reasoning behind [its] decision," *id.* (citation omitted), and to "consider and respond" to any non-frivolous arguments and

---

[5] The commanding officer's report was—or should have been—before the Board, as reflected by both the Board's chronology and the Navy instructions highlighting the importance of that report.  Because the PEB expressly acknowledged Commander Reina's assessment, that report also seems like it was—or should have been—before the Board.  *See supra* n.3.  That said, if the Board determines that Commander Reina's assessment was not properly part of the evidentiary record, it may so find and "explicitly indicate the reasons for its decision."  *Calloway v. Brownlee*, 366 F. Supp. 2d 43, 55 n.9 (D.D.C. 2005).

significant evidence that it "fail[ed] to address," *Pettiford*, 774 F. Supp. 2d at 185 (collecting cases remanding to review boards). Here, the Board failed to address key evidence favorable to Byrd, so "the appropriate remedy [is] a remand to the [Board] for it to do so in the first instance." *Id.* at 183.

## IV. Conclusion

For all the above reasons, the Court will grant Plaintiff's Cross-Motion for Summary Judgment, deny Defendant's Motion for Summary Judgment, and remand this case to the Board for further proceedings consistent with this opinion. A separate order will issue.

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: September 3, 2024